UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

ANASTASIA TIMOTHY,

    Plaintiff,

    v.

ROBERT F. KENNEDY, JR.,
*in his official capacity as*
*Secretary of Health and Human Services*,

    Defendant.

Civil Action No. 24-3313-TDC

## MEMORANDUM OPINION

Plaintiff Anastasia Timothy, an employee of the United States Department of Health and Human Services ("HHS"), has filed this action alleging employment discrimination based on sex and national origin, a hostile work environment, and unlawful retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17. The Secretary of Health and Human Services, the defendant in this case, has filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. Upon review of the submitted materials, the Court finds that no hearing is necessary. D. Md. Local R. 105.6. For the reasons set forth below, the Motion, considered only as a Motion to Dismiss, will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

In the operative Amended Complaint and its attachments, Timothy alleges the following facts, which the Court accepts as true for purposes of resolving the Motion.

## I.    Early Allegations

Anastasia Timothy, a Russian American woman with a Russian medical degree, has worked at HHS since 2008 and currently serves as a Public Health Analyst in the Policy and Disputes Branch, Division of Practitioner Data Bank, Bureau of Health Workforce, Health Resources and Services Administration. Her primary responsibilities are to "review disputed reports and draft decision letters." Timothy Aff. No. 1 at 3, Am. Compl. Ex. 1, ECF No. 21. She believes that these dispute resolution tasks are "less prestigious" and would prefer policy-oriented work, opportunities to expand her skillset, and eventually a leadership role. *Id.* at 6, 20–21. After being denied promotions in 2012 and 2015, she was promoted to the General Schedule ("GS")-13 level of the civil service in 2016, but her responsibilities remained the same. In June 2019, after Timothy had applied for the Presidential Management Cohort training program, a Filipina woman with less experience than Timothy was selected instead of her. According to Timothy, "[s]ince 2010, all my attempts and requests to do more than Dispute Resolution Review ha[ve] been met with negative attitude, hostility, [and] aggressive denial." *Id.* at 28.

Timothy asserts that during her time at HHS, supervisors and coworkers have made negative comments about her Russian background. In 2012, Timothy's former supervisors, including first-level supervisor Linda Redmond and second-level supervisor Judy Rodgers, suggested that she take accent reduction training because the "Russian accent is not really welcomed in America." *Id.* at 5. Although Timothy apparently applied to receive the training, her request was denied. That same year, after Timothy was denied a promotion to GS-13, Rodgers told her that her Russian medical degree "has no value" because Timothy lacked an American high school diploma. *Id.* Timothy also alleges that at other unspecified times since 2010, various unnamed coworkers asked Timothy offensive questions about her Russian background, including

2

whether she drank a bottle of vodka every day, whether she rode a bear in high school, and whether she was a spy or a communist.

Timothy alleges that in July 2019, her first-level supervisor, Matt Wiley, denied that she had worked on a project that he had presented as his own work, yelled at her, and chased her down a hallway after she left the room. When she asked her second-level supervisor, Melissa Moore, and her third-level supervisor, David Loewenstein, to be present during her next meeting with Wiley, they did not agree to do so.

Timothy also asserts that in 2018 and 2019, she applied for but was not selected for six different promotion opportunities.

## II.    2020-2021 Allegations

Since April 2020, Timothy's first-level supervisor has been Carolyn Nganga-Good, a Kenyan American woman. Moore, described by Timothy as a woman of "American" national origin, and Loewenstein, described by Timothy as a man of "American" national origin with ancestry from various European countries other than Russia, remained her second- and third-level supervisors, respectively. Am. Compl. ¶¶ 13–14, ECF No. 21.

### A.    Initial Protected Activity

On April 22, 2020, Timothy served as a witness and provided an affidavit in support of a coworker's equal employment opportunity ("EEO") complaint against HHS. On May 27, 2020, after Timothy told Nganga-Good that she was a witness in her coworker's EEO case, Nganga-Good told Timothy that her "involvement in the EEO case as a witness is not important and will not help the person who filed the original complaint." *Id.* ¶ 18(e).

Timothy alleges that following her participation in her coworker's EEO complaint, she was subjected to a series of actions against her that she deems to be retaliatory and to create a hostile

3

work environment. For example, on May 13, 2020, Timothy's request to continue with her Performance Management Appraisal Program ("PMAP") tasks, which would have "included more policy work rather than dispute resolution cases," was denied. *Id.* ¶ 18(d). On June 4, 2020, Timothy complained to Loewenstein that Nganga-Good had asked "intrusive questions" about Timothy's health, required too many evaluation meetings under the PMAP, and avoided responding to her questions. Timothy Aff. No. 1 at 33. Later that day, Nganga-Good sent Timothy a "Professional Misconduct" notice by email. In the email, Nganga-Good called Timothy's behavior "unprofessional," told Timothy that she is "expected to comply with supervisory instructions moving forward," and sought to enforce the HHS "Residual Standards of Conduct" against Timothy for the first time. *Id.* Four days later, on June 8, 2020, Loewenstein responded to Timothy by declining to address her complaints about Nganga-Good, stating "I want to remind you of the need to remain professional while on duty and to follow [your] supervisor's instructions," and referring her to the Employee Assistance Program to address any stress she was undergoing. *Id.* at 34–35. Timothy interpreted these communications as accusing her of insubordination and discouraging her from conveying concerns about her work and her supervisor's behavior.

On June 17, 2020, Timothy spoke with a coworker, Claudia Rausch, and questioned why Nganga-Good's allegations of "misconduct'" came after she had engaged in EEO protected activity and had herself complained about Nganga-Good to Loewenstein. *Id.* at 36–37. When Nganga-Good learned of this exchange, she accused Timothy of additional misconduct and told her that "further questioning and disagreement" would be "disruptive." *Id.* at 36.

On July 7, 2020, Nganga-Good issued a PMAP evaluation in which she referred to Timothy as "Ms. Timothy" instead of "Dr. Timothy," which Timothy found to be disrespectful and

humiliating. *Id.* at 42. On July 15, 2020, after Timothy suggested ways to strengthen a policy relating to the Freedom of Information Act, Nganga-Good raised her voice and told Timothy not to "question her decisions." *Id.* at 44. That same day, Timothy contacted Luis Padilla, the Administrator of the Bureau of Health Workforce, to express concerns about her supervisors' behavior and insufficient cultural competency toward her Russian background. In his response on July 20, 2020, Padilla told her to "follow your chain of command" and "report your concerns to David Loewenstein for review and proper action." *Id.* at 45–46. The next day, Nganga-Good issued to Timothy a "formal written warning for inappropriate conduct and threatened to take formal corrective action against her." Am. Compl. ¶ 18(h).

On July 22, 23, and 27, 2020, Nganga-Good assigned a peer reviewer "to scrutinize and exaggerate the severity of errors" in Timothy's drafts of dispute decisions. *Id.* ¶ 18(i). On July 29, 2020, Nganga-Good instructed Timothy to label an electronic folder using a client's last name rather than initials, which Timothy asserts could have subjected her to personal liability for disclosing personally identifiable information. On August 5 and 12, 2020, Nganga-Good held Timothy "accountable" for missing early morning meetings of which she was unaware because they were scheduled the day before, after the end of Timothy's workday. Timothy Aff. No. 1 at 53.

On August 5, 2020, when Timothy reiterated to Nganga-Good her preference for quarterly rather than weekly one-on-one meetings, Nganga-Good called Timothy "disrespectful" for doing so. *Id.* at 55. On August 6, 2020, Nganga-Good told Timothy that her request to take sick leave, even though approved, constituted a missed deadline. The same day, Nganga-Good required Timothy to reschedule meetings that she had missed while on leave, a requirement not imposed on

5

other colleagues.  On August 10, 2020, Nganga-Good required her to attend an "urgent meeting" at which she repeatedly raised her voice at Timothy.  *Id.* at 60.

After these incidents, Timothy complained to Moore about what she perceived to be harassing and retaliatory behavior by Nganga-Good.  On August 11, 2020, however, Moore declined to address her complaints and referred her to the Office of Human Resources. Subsequently, on August 12, 2020, Nganga-Good issued to Timothy a "Memorandum of Counseling and Expectations" for alleged "unacceptable performance."  *Id.* at 63.  On August 13, 2020, when Timothy corrected Nganga-Good's pronunciation of a colleague's name, Nganga-Good accused Timothy of being condescending.

## B.    EEO Complaint

During this time frame, Timothy had made an informal complaint to the HHS EEO office about alleged discrimination against by her supervisors.  On August 16, 2020, after completing the informal stage of the EEO process, Timothy filed a formal EEO complaint with HHS, which she later amended six times between October 27, 2020 and July 1, 2021 to add references to additional incidents.    Her EEO claim alleges national origin and sex discrimination, a hostile work environment based on national origin and sex, and retaliation.

According to Timothy, the retaliatory conduct continued.  After the filing of her EEO complaint, in the weeks leading up to September 23, 2020, she was not selected for five positions that would have been promotions.  On October 29, 2020, Nganga-Good sent Timothy an email accusing her of unprofessional and disruptive behavior arising from Timothy's assertions in a prior conversation that Nganga-Good had not provided "proper justification" for an assignment.  *Id.* at 71.  Although Timothy requested a reassignment to a different branch in order to escape the alleged harassment, on November 12, 2020, Moore denied that request.  On November 18, 2020, Nganga-

Good issued to Timothy a "Letter of Reprimand" for an allegedly inappropriate communication. Am. Compl. ¶ 18(o). According to Timothy, the letter of reprimand remains in her personnel file "as a disciplinary action" and thus hinders her employment opportunities. Timothy Aff. No. 1 at 75.

On January 25, 2021, Nganga-Good denied requests that Timothy had made to shift her work from dispute resolution review to budget duties and to allow her to acquire a certification as a Contracting Officer's Representative. The next day, on January 26, 2021, Nganga-Good issued a PMAP performance evaluation for Timothy with a rating of 3.0, a low score. On February 9, 2021, after Timothy refused to sign her PMAP evaluation because she disagreed with the rating, Nganga-Good referenced Timothy's EEO complaint in a statement accompanying the PMAP evaluation. The next day, after Timothy had remained silent to avoid disciplinary action, Nganga-Good accused Timothy of "ghosting" her, which Timothy understood to mean "when someone rejects a sexual relationship." Timothy Aff. No. 2 at 12, Am. Compl. Ex. 2, ECF No. 21.

On February 12, 2021, Timothy sent an email to Moore and Loewenstein recounting the allegedly harassing incidents and told them that as a result she felt harassed, disrespected, and afraid to speak. Moore responded that she had no reason to believe that Timothy was experiencing harassment. On February 19, 2021, Moore denied a request by Timothy for Moore and Loewenstein to be present during Timothy's one-on-one meetings with Nganga-Good. That same day, Moore accused Timothy of "not being diligent or responsive with updates and deliverables during her one-on-one meetings" with Nganga-Good. Am. Compl. ¶ 18(s). On February 24, 2021, Nganga-Good accused Timothy of sending "bizarre and disruptive" agenda items for their one-on-one meetings. *Id.* ¶ 18(t). On March 10, 2021, Nganga-Good accused Timothy of speaking with

7

a "harsh" tone, which Timothy denies and attributes instead to her "direct" communication style that "reflects [her] national origin." Timothy Aff. No. 2 at 25.

On March 15, 2021, Nganga-Good issued to Timothy a proposed suspension "for disrespectful behavior and failure to follow instructions." Am. Compl. ¶ 18(v). Two weeks later, on March 29, 2021, Nganga-Good denied a request by Timothy for one hour of leave to attend a psychiatric appointment in order to seek a letter to help rebut the proposed suspension. On April 8, 2021, Nganga-Good accused Timothy of violating HHS policy when, the previous day, Timothy had a panic attack during a one-on-one meeting with Nganga-Good and took sick leave for the rest of the day without prior written approval. Nganga-Good allegedly ignored a sick leave request submitted by Timothy four days later. According to Timothy, on April 14, 2021, she was "publicly humiliated" when she was disconnected from a teleconference on which she was supposed to make a presentation to 1,600 registrants. Timothy Aff. No. 3 at 17–18, Am. Compl. Ex. 3, ECF No. 21.

On April 15, 2021, Moore issued to Timothy a suspension lasting from April 18 to 24, 2021. The "Decision to Suspend" cited Timothy's disrespect toward a supervisor and failure to follow instructions, the circumstances of which Timothy disputes. *Id.* at 21–24.

### C.    2020-2021 Non-Promotions

During 2020, prior to the filing of her EEO complaint on August 16, 2020, Timothy applied for but was either not interviewed or not selected for at least seven positions, any of which would have been a promotion to GS-14. These included a Supervisory Management Analyst position dated January 29, 2020; a Health Scientist position dated March 26, 2020; a Lead Public Health Analyst position dated May 12, 2020; a Supervisory Management and Program Analyst (Branch Chief) position dated July 24, 2020; two Supervisory Public Health Analyst (Branch Chief)

positions dated July 24 and July 31, 2020; and a Public Health Advisor position dated July 31, 2020.

Timothy also asserts that in the weeks before September 23, 2020, she was denied the opportunity to interview for, or was not selected for, the following five positions that would have been promotions: a Supervisory Social Scientist (Branch Chief) position dated August 7, 2020; a Supervisory Financial Program Integrity Specialist position dated August 13, 2020; two Public Health Analyst positions dated August 26, 2020; and a Lead Public Health Analyst position dated September 4, 2020.

According to Timothy, none of the candidates interviewed or selected for these positions were Russian, and Timothy does not know whether most were men or women. Timothy states that she "would be a great asset for all the listed positions" because she is a "[p]reventive [m]edicine physician experienced in clinical, statistical, and regulatory science input to execute regulatory science and medical research programs." Timothy Aff. No. 1 at 17, 69–70. She also states that she was particularly qualified for certain positions focused on COVID-19 because she is "experienced in infectious disease[] outbreaks and implementations of a variety of scientific research and regulatory programs including budget determination and justification." *Id.* at 19.

In her Amended Complaint, Timothy alleges that she was subjected to discrimination and retaliation based on the failure to promote her to four of the positions to which she applied. Based on her references to the positions' vacancy numbers, these positions are the Supervisory Management Analyst position dated January 29, 2020; the two Supervisory Public Health Analyst (Branch Chief) positions dated July 24 and July 31, 2020; and the Supervisory Financial Program Integrity Specialist position dated August 13, 2020. Timothy has not specified the dates on which,

9

for each position, she applied for the position, was denied an interview, and was denied the position.

**III.    Procedural History**

The administrative proceedings following Timothy's August 2020 EEO complaint continued for four years.  From February to July 2021, HHS EEO investigators collected 28 affidavits, including from Timothy, Nganga-Good, Moore, Loewenstein, Padilla, and other managers, selecting officials, and witnesses.  The investigators also collected documents, emails, HHS policies, and other evidence relating to Timothy's allegations.  After Timothy requested a hearing before an EEOC administrative judge, Timothy requested written discovery that, according to HHS, led to the production of 30 pages of interrogatory responses and 642 pages of documents.  On May 29, 2024, Timothy withdrew her request for a hearing before an administrative judge and requested a Final Agency Decision on her complaint from HHS.  On August 23, 2024, HHS issued its Final Agency Decision concluding that the agency did not discriminate or retaliate against Timothy.

On November 16, 2024, Timothy filed the original Complaint in this case.  In the presently operative Amended Complaint, which includes as exhibits three affidavits submitted by Timothy during the administrative proceedings, Timothy alleges violations of Title VII in the following numbered counts: (1) sex discrimination; (2) a hostile work environment based on sex, national origin, and retaliation; (3) national origin discrimination; and (4) retaliation.

**DISCUSSION**

HHS has filed a Motion to Dismiss or, in the Alternative, for Summary Judgment in which it seeks dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), or summary judgment in its favor pursuant to Rule 56.  With the Motion, HHS has submitted a record consisting of HHS's

10

Report of Investigation and source materials for the report, including Timothy's EEO complaint; 28 affidavits, including those of Timothy, her supervisors, certain selecting officials, and other witnesses; documents from Timothy's personnel file, including her performance evaluations and letters of reprimand; email exchanges between Timothy and her supervisors; job postings; HHS policies; and other administrative documents. HHS has also submitted as exhibits to the Motion additional emails and files that served as Timothy's exhibits to her administrative pre-hearing statement, Timothy's May 29, 2024 request for a Final Agency Decision and withdrawal of her request for a hearing before an EEOC administrative judge, and HHS's August 23, 2024 Final Agency Decision.

## I.     Motion for Summary Judgment

As a threshold issue, the parties dispute whether the Court may treat the Motion as a Motion for Summary Judgment at this early stage of the case, before any discovery has taken place. Although a party may move for summary judgment before the commencement of discovery, *see* Fed R. Civ. P. 56(b), "summary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)). The proper procedure for seeking additional time for discovery is to file an affidavit pursuant to Rule 56(d) explaining why the party needs discovery to establish the existence of a genuine issue of material fact. *Id.* When a party has done so, its "request is 'broadly favored and should be liberally granted.'" *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 281 (4th Cir. 2013) (quoting *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010)).

Timothy, the nonmoving party, has filed a Rule 56(d) declaration in which her counsel states that Timothy "disputes most or all of the material factual allegations made by HHS," and that discovery at this stage is "necessary to fully respond to HHS's motion for summary judgment." Dettling Decl. ¶¶ 6–7, Opp'n Ex. 1, ECF No. 27-2. Timothy's counsel asserts that despite the submission of the HHS Report of Investigation and accompanying documents, she needs discovery on, among other issues, "management's motives for its abusive conduct," its "knowledge of any alleged protected activity by Timothy," "the factual bases of the investigations and inquiries into Timothy and her conduct," and "comparative treatment between Timothy and others." *Id.* ¶ 7. More specifically, she asserts that Timothy needs discovery of documents and other evidence relating to the non-selection of Timothy for the four promotions referenced in the Amended Complaint, and that she should have the opportunity to take the depositions of Nganga-Good, Moore, Lowenstein, and Padilla, as well as of other HHS employees who participated in the selection decisions for the four positions. *Id.* ¶ 7(d), (f).

In contrast, HHS argues that Timothy is not entitled to discovery now in part because HHS compiled a substantial collection of documents relevant to its Report of Investigation, and Timothy "already engaged in lengthy discovery during the administrative process" but passed up the opportunity to conduct depositions at that time. Reply at 4, ECF No. 30.

In Title VII cases brought by federal employees, discovery is not categorically barred because the plaintiff already had access to discovery during the agency investigation and administrative proceedings relating to those claims. *See, e.g.*, *Works v. Colvin*, 519 F. App'x 176, 183 (4th Cir. 2013) (finding that a district court abused its discretion in denying discovery to the plaintiff even where the agency asserted that the plaintiff "had every opportunity to discover all pertinent facts" during proceedings before an administrative law judge, in part because certain

12

witnesses were neither deposed nor called to testify at the administrative hearing); *Faulkenberry v. U.S. Dep't of Defense*, 670 F. Supp. 3d 234, 250–51 (D. Md. 2023) (permitting discovery even though the plaintiff did not take full advantage of discovery during the EEOC proceeding because "the primary management official alleged to have discriminated and retaliated against" the plaintiff "has yet to be deposed"). Here, even though the HHS investigation led to the provision of written statements by the key HHS supervisors and employees in this case, where Timothy's claims require consideration of the intent and motivations of such witnesses, her request for depositions of these witnesses before consideration of a motion for summary judgment is entirely reasonable. *See McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 484 (4th Cir. 2014) (granting discovery pursuant to Rule 56(d) before consideration of summary judgment where "the main issue is one of motive and where most of the key evidence lies in the control of the moving party"). Indeed, to proceed to summary judgment without such an opportunity would be unfair. For these reasons, the Court will not consider a motion for summary judgment in this case until after discovery.

## II.    Motion to Dismiss

The Court therefore treats HHS's Motion solely as a Motion to Dismiss. To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable

13

to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Generally, in evaluating a Rule 12(b)(6) motion, a court considers only the complaint and any attachments to it. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). Courts are permitted, however, to consider a document attached to a motion to dismiss "when the document is integral to and explicitly relied on in the complaint, and when the plaintiffs do not challenge the document's authenticity." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015) (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)). Here, although the record submitted by HHS consists of documents relevant to this case, Timothy does not, in the Amended Complaint, reference or rely upon the HHS Report of Investigation or most of its underlying source documents. The Court therefore finds that the exhibits submitted with the Motion are not integral to the Amended Complaint and therefore may not be considered when ruling on the Motion to Dismiss. Although Timothy references her EEO complaint, which is contained within the Report of Investigation, where Timothy effectively reproduced it within her Amended Complaint by attaching the affidavits she submitted as part of the EEO complaint as exhibits to the Amended Complaint, its content will already be considered.

The Court will thus address whether the allegations in the Amended Complaint and its attachments state a plausible claim for relief.

## A.     Sex and National Origin Discrimination

In Counts 1 and 3, Timothy alleges Title VII claims of sex discrimination and national origin discrimination, respectively. Under Title VII, it is unlawful for an employer "to fail or refuse to hire . . . or otherwise to discriminate against any individual with respect to his

14

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). To state a Title VII discrimination claim, a plaintiff may demonstrate through direct or circumstantial evidence that sex or national origin "motivated the employer's adverse employment decision." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc). Alternatively, a plaintiff may proceed through the approach adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), "under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Hill*, 354 F.3d at 285. On a motion to dismiss, a plaintiff need not necessarily establish a *prima facie* case of discrimination, but "the complaint's factual allegations must allow a 'court to draw the reasonable inference that the defendant is liable'" for discrimination. *McCleary-Evans v. Md. Dep't of Transp., State Hwy. Admin.*, 780 F.3d 582, 585 (4th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678).

In Count 1, Timothy generally alleges that she was treated "less favorably than male employees" and was subjected "to a pattern of disparate treatment based on her sex." Am. Compl. ¶¶ 21–22. In Count 3, she generally alleges that she was treated "less favorably than employees not of Russian descent" and was subjected "to a pattern of disparate treatment based on her national origin." *Id.* ¶¶ 26–27. Most prominently, she alleges discrimination based on the failure to promote her to four specific positions: a Supervisory Management Analyst position dated January 29, 2020; two Supervisory Public Health Analyst (Branch Chief) positions dated July 24 and 31, 2020; and a Supervisory Financial Program Integrity Specialist position dated August 13, 2020. To allege a *prima facie* case of Title VII discrimination based on a failure to hire or promote, a complaint must include facts showing that the plaintiff: (1) is a member of a protected class; (2)

15

applied for the position in question; (3) was qualified for the position; and (4) was rejected for the position "under circumstances giving rise to an inference of unlawful discrimination." *Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998). As to the fourth prong, the fact that the position at issue was filled by an individual from outside the protected class, without allegations that the plaintiff was more qualified or better suited for the position, is not alone sufficient to support an inference of discrimination. *McCleary-Evans*, 780 F.3d at 586, 588.

Here, Timothy has alleged the first two prongs by asserting that she is a woman of Russian origin who applied for the various positions. In an affidavit attached to the Amended Complaint, she has generally asserted that she is qualified for the positions. Even assuming the sufficiency of those claims, Timothy fails to allege facts sufficient to satisfy the fourth prong so as to raise an inference of sex or national origin discrimination. First, for each position, the Amended Complaint does not state who was ultimately selected, whether they were male or female, and whether and how they were less qualified for the position than Timothy. *See id.* Although Timothy has attempted to correct that deficiency in her memorandum in opposition to HHS's Motion, a plaintiff cannot amend the complaint through assertions made in a brief on a motion to dismiss. *Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997).

As for her other claims of disparate treatment, Timothy generally alleges sex and national origin discrimination based on a series of actions against her that she asserts would not have occurred had she been male or non-Russian. To state a *prima facie* claim of discrimination based on disparate treatment, a plaintiff must present facts demonstrating: (1) membership in a protected class; (2) satisfactory job performance; (3) that the plaintiff was subjected to an adverse employment action; and (4) that similarly situated employees outside the protected class received

16

more favorable treatment under similar circumstances. *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

Many of Timothy's disparate treatment claims do not satisfy the third prong, and none satisfy the fourth. Under *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024), the adverse employment action need only inflict "some harm respecting an identifiable term or condition of employment." *Id.* at 974. The harm need not be "significant," "serious," or "substantial." *Id.* Even under this permissive standard, many of the allegedly discriminatory actions, including instructing a peer reviewer to exaggerate errors in Timothy's writing and accusing Timothy of providing disruptive agenda topics for meetings, would not qualify because they do not affect the terms and conditions of Timothy's employment, that is, "the what, where, and when" of her work. *Id.*

Although some allegations, such as the issuance of a letter of reprimand or a low performance evaluation, may qualify, Timothy has not alleged sufficient facts to support a claim of disparate treatment. Generally, Timothy provides only cursory claims that her supervisors would not have treated a man or a non-Russian in the same way that she was treated. For example, in relation to the "[p]rofessional misconduct email" that Timothy received from Nganga-Good on June 4, 2020, she asserts only that "[a] male would not be issued a '[m]isconduct notice' after asking questions and/or having concerns about their first-level supervisor" and that "I believe I would not be issued this notice if I were non-Russian." Timothy Aff. No. 1 at 34. Similarly, in relation to the suspension she received in April 2021, Timothy states: "I believe [that] Nganga-Good would never issue an unwarranted [s]uspension to a male employee" or "to a non-Russian employee." Timothy Aff. No. 3 at 25. This kind of speculation, however, is insufficient to support an inference of discrimination, particularly where Timothy has failed to provide additional facts

demonstrating that such unnamed comparators are similarly situated in that they have the same supervisor, the same job duties and performance standards, and engaged in similar conduct, but were treated more favorably than Timothy. *See Barnhill v. Bondi*, 138 F.4th 123, 131 (4th Cir. 2025); *Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 420 (D. Md. 2015) (listing relevant factors to establish a similarly situated comparator).

More broadly, Timothy has not otherwise alleged direct or circumstantial evidence supporting an inference of discrimination in relation to her non-promotions or any of the other challenged actions by her supervisors. She does not allege any statements of discriminatory animus based on sex. Although she references some statements by supervisors that could be viewed as derogatory of Russians, including when her former supervisors advised her in 2012 to get accent reduction training because the "Russian accent is not really welcomed in America" and a statement in 2012 by her second-level supervisor, Rodgers, that her Russian medical degree "has no value," Timothy Aff. No. 1 at 5, such statements occurred over a decade ago under different supervisors, so the Court does not find that they support an inference of discrimination by her present supervisors. *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010) (stating that "[i]t is the decision maker's intent that remains crucial" and that "the most unfortunate expressions and beliefs of those around him" are not ordinarily attributed to him). Similarly, Timothy's references to statements by unnamed coworkers at unspecified times referencing vodka, bears, and communism, even if offensive, do not support an inference of discrimination by Timothy's present supervisors, who are not alleged to have made the statements or to have received reports about them from Timothy or anyone else.

The Motion will therefore be granted as to the claims of sex discrimination and national origin discrimination in Counts 1 and 3.

## B.    Retaliation

In Count 4, Timothy alleges that she was subjected to retaliation for protected EEO activity. The Title VII provision relating to retaliation claims states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any . . . individual . . . because he has opposed any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a).   To state a retaliation claim under Title VII, a plaintiff must allege facts supporting the conclusion that (1) the plaintiff engaged in a protected activity; (2) the employer took a materially adverse action against the plaintiff; and (3) "the protected activity was causally connected to the employer's adverse action." *Okoli v. City of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011) (citation omitted).

As to the first element, protected activity of "oppos[ing] . . . an unlawful employment practice" under Title VII includes "making a charge" of a violation of Title VII, as well as "testifying . . . assisting . . . or participating in any manner in an investigation, proceeding, or hearing under Title VII." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).  Here, Timothy has properly alleged that she engaged in protected activity when she provided an affidavit for her coworker's EEO case on April 22, 2020.  She also engaged in protected activity when she filed her own EEO complaint with HHS on August 16, 2020.  Timothy has alleged facts showing that her supervisor, Nganga-Good, was aware of her protected activity, including Nganga-Good's statement on May 27, 2020 that Timothy's testimony in her coworker's EEO case was "not important" and "will not help" the complainant, *see* Am. Compl. ¶ 18(e), and Nganga-Good's reference to Timothy's EEO complaint in Timothy's February 2021 PMAP evaluation.

As to the second element, a "materially adverse" action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). HHS argues that of the adverse actions alleged by Timothy, only the suspension and failures to select her for promotions can qualify as materially adverse actions because they are the only adverse actions that affected the terms, conditions, or benefits of her employment. This argument, however, incorrectly applies the former, pre-*Muldrow* standard for Title VII discrimination claims to Title VII retaliation claims, which are governed by the *Burlington Northern* standard. The United States Court of Appeals for the Fourth Circuit has reiterated this distinction by stating that for a retaliation claim, a plaintiff need not identify "adverse actions that alter the terms and conditions of employment," that the proper standard is as stated *Burlington Northern*, and that this standard serves to separate "minor harms from those that threaten to chill employees from opposing unlawful discrimination." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 213 (4th Cir. 2022).

Under this standard, Timothy has alleged multiple materially adverse actions, including the issuance of a professional misconduct notice enforcing HHS standards for the first time in June 2020; her non-selection for promotions in August or September 2020; the denial of a request for assignment to a different branch in November 2020; the issuance of a letter of reprimand that was placed in her personnel file in November 2020; the issuance of a low PMAP score in January 2021; and her suspension in April 2021.

Finally, as to the third element, causation for a retaliation claim may be shown through "the existence of facts that suggest that the adverse action occurred because of the protected activity." *Id.* at 218 (quoting *Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021)). At the motion-to-dismiss stage, causation can be inferred based on the temporal proximity between the protected

20

activity and the materially adverse action, particularly when the materially adverse action occurs within two months after the protected activity. *Barnhill*, 138 F.4th at 132. "However, even in the absence of temporal proximity, causation can be established through a pervasive sequence of intervening events indicating disdain for or intermeddling with the protected activity." *Id.*

Here, causation may be inferred from the temporal proximity between Timothy's EEO activity and certain materially adverse actions. First, on June 4, 2020, within two months after Timothy provided an affidavit in her coworker's EEO case on April 22, 2020, Nganga-Good issued to Timothy a "Professional Misconduct" email notice through which she sought to enforce the HHS "Residual Standards of Conduct" for the first time. Timothy Aff. No. 1 at 33. Second, in the time period leading up to September 23, 2020, approximately one month after Timothy's filing of her own EEO complaint on August 16, 2020, Timothy was not interviewed for or not selected for several HHS positions for which she applied. Further, Timothy has alleged other materially adverse actions which, while not occurring within two months of the protected activity, provide further support on the issue of causation because they could fairly be construed to be part of "a pervasive sequence of intervening events," beginning with the temporally proximate actions referenced above, that could show "disdain for or intermeddling with the protected activity." *Barnhill*, 138 F.4th at 132. These actions include the letter of reprimand in November 2020, the negative PMAP evaluation in January 2021, and the suspension in April 2021.

Because the Amended Complaint includes sufficient allegations to support the elements of a Title VII retaliation claim, the Motion will be denied as to Count 4.

**C.      Hostile Work Environment**

In Count 2, Timothy alleges that HHS subjected her to (1) a hostile work environment based on sex and national origin; and (2) a retaliatory hostile work environment based on her protected EEO activity.

### 1.      Discriminatory Hostile Work Environment

Under Title VII, a discriminatory hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). A plaintiff asserting a discriminatory hostile work environment claim must allege facts that plausibly support inferences that (1) the plaintiff experienced unwelcome conduct; (2) the conduct was based on the plaintiff's race, color, national origin, religion, or sex; (3) the conduct was sufficiently severe or pervasive to create a hostile or abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Laurent-Workman*, 54 F.4th at 210.

Timothy has plausibly alleged that the series of negative interactions she had with her supervisors constituted unwelcome conduct. She has also alleged facts supporting the conclusion that her supervisors' conduct is attributable to HHS both because she has alleged that the harassment resulted in a tangible employment action consisting of the failure to promote her, and because HHS has neither argued that it "exercised reasonable care to prevent and correct any harassing behavior" by Timothy's supervisors nor argued that she "unreasonably failed to take advantage of the preventive or corrective opportunities" offered by HHS. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). As for the last two elements, the Court need not decide whether

22

the negative interactions were sufficiently severe or pervasive to establish a hostile or abusive environment because Timothy has not alleged facts sufficient to support a plausible claim that the unwelcome conduct was based on sex or national origin. As discussed above, she has alleged no derogatory statements about women, the statements by supervisors relating to her Russian identity date back over 10 years and were made by different supervisors, and there is no allegation that the other, undated statements by coworkers were made by the supervisors who engaged in the unwelcome conduct. *See supra* part II.A. Where Timothy has identified no specific male or non-Russian employees who were similarly situated to her within HHS and engaged in similar conduct as compared to the actions she took prior to the allegedly harassing activity, she has also failed to provide sufficient facts to support her cursory claims that men or non-Russians would not have faced similar harassing activity. Therefore, the Motion will be granted as to Timothy's claim of a hostile work environment based on sex or national origin.

### 2. Retaliatory Hostile Work Environment

As for Timothy's claim of a retaliatory hostile work environment, to state such a claim, a plaintiff must allege facts that plausibly support inferences that (1) the plaintiff experienced unwelcome conduct; (2) the conduct was "sufficiently severe or pervasive that it would dissuade a reasonable worker from making or supporting a charge of discrimination"; and (3) there is a basis for imposing liability on the employer. *Laurent-Workman*, 54 F.4th at 218. As discussed above, Timothy has alleged that she experienced unwelcome conduct by supervisors attributable to HHS. As for the remaining element, for a retaliatory hostile work environment claim, the "severe or pervasive" conduct notably need not, as for a discriminatory hostile work environment claim, "alter the conditions . . . of employment and create an abusive or hostile atmosphere." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 207–08 (4th Cir. 2019). Rather, the requirement of conduct

23

"sufficiently severe or pervasive that it would dissuade a reasonable worker from making or supporting a charge of discrimination" may be satisfied by conduct such as "a series of unpredictable management decisions," "acts of sabotage," "erroneous reprimands," "bogus denials of professional training opportunities," and "alteration of work product in a manner damaging to" the plaintiff. *Laurent-Workman*, 54 F.4th at 218. For example, in *Laurent-Workman*, the Fourth Circuit held that a plaintiff had properly pleaded a retaliatory hostile work environment claim based on a series of events following her complaint of race discrimination, including that she was reprimanded after she completed a work assignment, directed to contact another office to obtain a document that her supervisor already had, denied an opportunity to attend a training session, prevented from presenting at an important work meeting in order to embarrass her, given unexpected responsibilities and mocked when she said she could not take on the extra work, and given a significantly lower interview score than other applicants for a position for which then she was not selected. *See id.* at 208–09, 218.

Here, the Court has already determined that several of the actions taken against Timothy after she engaged in protected activity constituted materially adverse actions in that they could dissuade a reasonable worker from engaging in protected activity, including the issuance of a professional misconduct notice, several non-selections for promotion, a denial of a reassignment to another branch, a letter of reprimand, a low performance evaluation, and a suspension. *See supra* part II.B. In addition, Timothy has alleged other actions taken against her after her protected activity that might "not amount to much when considered in isolation," but upon a consideration of "the totality of the circumstances," could collectively meet this standard. *Laurent-Workman*, 54 F.4th at 218. Such conduct includes the May 2020 denial of her request to continue with her PMAP tasks, which included her favored area of policy work; a June 2020 allegation of misconduct

24

for reporting her concerns about her supervisor to a colleague; an August 2020 decision to treat her approved sick leave request as a missed deadline; an August 2020 requirement, not applied to other employees, that she reschedule meetings that she missed while she was on leave; and a January 2021 denial of her request to obtain a certification as a Contracting Officer's Representative. Although the overall list of incidents may not describe conduct as severe or pervasive as in *Laurent-Workman*, and there may prove to be legitimate reasons for these actions, where Timothy has alleged a substantial number of arguably harassing adverse actions taken against her following her protected activity, and the Court must view the allegations in the light most favorable to Timothy at this early stage, the Court finds that she has adequately pleaded a retaliatory hostile work environment and will deny the Motion as to that claim.

## CONCLUSION

For the foregoing reasons, HHS's Motion to Dismiss or, in the Alternative, for Summary Judgment, construed as a Motion to Dismiss, will be GRANTED IN PART and DENIED IN PART. The Motion will be granted as to the sex discrimination claim in Count 1, the discriminatory hostile work environment claim in Count 2, and the national origin discrimination claim in Count 3, all of which will be DISMISSED WITHOUT PREJUDICE. The Motion will be denied as to the retaliatory hostile work environment claim in Count 2 and the retaliation claim in Count 4. A separate Order shall issue.

Date:  October 28, 2025

THEODORE D. CHUANG
United States District Judge